# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

TIMOTHY D. CAPRON,

                                        Plaintiff,

            v.                                              5:12-CV-1618
                                                            (TJM/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

HOWARD D. OLINSKY, ESQ., for Plaintiff
REBECCA H. ESTELLE, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable
Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636
(b) and Local Rule 72.3(d). This case has proceeded in accordance with General
Order 18.

## I.    PROCEDURAL HISTORY

Plaintiff first applied for a period of disability and Disability Insurance Benefits
("DIB"), which was initially denied on November 14, 2001. (T. 17). Plaintiff alleged
disability beginning May 8, 1996. No review was sought of the initial denial. On
November 5, 2008, plaintiff protectively filed[1] the current DIB application, also
alleging disability beginning May 8, 1996. (T. 75, 229-33). His application was

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing"
indicates that a written statement, "such as a letter," has been filed with the Social Security
Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340.
There are various requirements for this written statement. *Id.* If a proper statement is filed, the Social
Security Administration will use the date of the written statement as the filing date of the application
even if the formal application is not filed until a future date.

denied initially on January 13, 2009, and plaintiff requested a hearing. (T. 75-80, 81-82). A hearing was held on May 11, 2010, before Administrative Law Judge ("ALJ") Rosanne M. Drummer, at which plaintiff and Vocational Expert ("VE") Dothal Edwards, Ph.D., testified. (T. 48-74). After the hearing, the ALJ obtained additional evidence by sending interrogatories to two medical experts: Stuart Gitlow, M.D., Board Certified in General Medicine and Kenneth L. Cloninger, M.D., a specialist in Neurological Surgery. (T. 17, 570-71, 590-97).

ALJ Drummer held a second hearing on December 2, 2010, at which VE Jay A. Steinbrenner testified, and at which plaintiff appeared, but did not testify.[2] (T. 36-47). The ALJ issued a decision denying benefits on December 13, 2010. (T. 17-30). The ALJ's decision became the final decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on August 31, 2012. (T. 1-3).

The court notes that plaintiff's insured status for purposed of DIB expired on December 31, 2001. Accordingly, the issue in this case is whether the plaintiff became disabled between November 14, 2001 and December 31, 2001.

## II.    ISSUES IN CONTENTION

The plaintiff makes the following claims:

(1)    The ALJ erred in failing to find that plaintiff met Listing 11.02. (Pl.'s Br. at 13-17) (Dkt. No. 13).

(2).    The ALJ's Residual Functional Capacity ("RFC") determination is not supported by substantial evidence. (Pl.'s Br. at 17-19).

(3)    The ALJ's erred in her credibility analysis. (Pl.'s Br. at 19-21).

(4)    The ALJ improperly discredited statements by plaintiff's mother,

---

[2] Plaintiff was represented by counsel at both hearings.

Geraldine Helmer, regarding the frequency and characteristics of plaintiff's seizures. (Pl.'s Br. at 21-23).

(5)     The testimony of the VE was based upon an improper hypothetical, and thus, the determination that plaintiff could perform work in the national economy is not supported by substantial evidence. (Pl.'s Br. at 23-25).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed, dismissing the complaint in its entirety. (Dkt. No. 14). For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.    APPLICABLE LAW

### A.    Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections

404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him [per se] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Selian v. Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F3d 145, 151 (2d Cir. 2012)); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity"); *Selian*, 708 F.3d at 418 & n.2.

## B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d at 417 (quoting *Talavera v. Astrue*,

697 F.3d at 151; *Brault v. Soc. Sec. Admin, Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g)). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* This standard is a very deferential standard of review " – even more so than the 'clearly erroneous standard.'" *Brault*, 683 F.3d at 448.

In order to determine whether an ALJ's findings are supported by substantial evidence, the reviewing court must consider the whole record, examining the evidence from both sides, "'because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403-404 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) (citing *Williams*, *supra*).

## IV.   **FACTS**

Plaintiff's brief contains a lengthy statement of facts that defense counsel has incorporated into her brief,[3] in addition to the statement of facts contained in the ALJ's decision. (Pl.'s Br. at 2-12, Def.'s Br. at 2). The court will also adopt the facts as stated by plaintiff, as well as the facts stated by the ALJ in her decision, with any

---

[3] Defense counsel stated that she does not incorporate any "arguments or inferences" that might be contained in plaintiff's statements of facts. (Def.'s Br. at 2).

exceptions as noted in the court's discussion of the issues.

## V. ALJ's DECISION

Prior to her analysis of the issues in this case, the ALJ discussed plaintiff's prior application for DIB, claiming disability beginning in 1996. (T. 17-18). As stated above, the prior application was denied initially on November 14, 2001, and plaintiff did not seek further review of that denial. Because plaintiff did not appeal the denial, the Commissioner's determination that plaintiff was not disabled any time prior to November 14, 2001 became "administratively final." (*Id.*)

In plaintiff's current application, he again seeks DIB, beginning in 1996, which is "within the previously adjudicated time period." As noted by ALJ Drummer, because the onset date is within the previously adjudicated period, there is an "implied request for reopening." The ALJ found that there was no basis for reopening because more than four years have passed since the notice from the prior determination, and there was no evidence of fraud, similar fault, or any of the other factors set forth in 20 C.F.R. § 404.988.[4] (T. 17). The ALJ specifically stated that she was only reviewing

---

[4] 20 C.F.R. § 404.987(a) provides that if a claimant is dissatisfied with a determination or decision made during the administrative review process, but fails to request further review during the stated time period, he or she loses the right to review, "and that determination becomes final." The section further provides that in certain circumstances, a final decision may be reopened, and those conditions are listed in 20 C.F.R. § 404.988. 20 C.F. R. 404.987(b). Generally, the federal court lacks jurisdiction to review an administrative decision not to reopen a previous claim for benefits. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Califano v. Sanders*, 430 U.S. 99, 107-109 (1977)). The Commissioner's decision not to reopen is not considered a "final decision" for purposes of section 405(g), and therefore, unreviewable. *Id.* at 180 (citing *Latona v. Schweiker*, 707 F.2d 79, 81 (2d Cir. 1983)). Notwithstanding this rule, federal courts may review a decision to reopen if the Commissioner has "constructively reopened" the case or where the claimant has been denied constitutional due process. *Id.* In this case, the prior decision denying benefits was November 14, 2001, and plaintiff's insured status expired December 31, 2001. Thus, plaintiff must show that he became disabled between November 14, 2001 and December 31, 2001. Although the ALJ stated that

evidence from the previously adjudicated period because the medical evidence was "sparse," and the ALJ wished to give plaintiff the benefit of doubt. (T. 18).

The ALJ found that plaintiff had the following severe impairments: a seizure disorder that was likely due to head trauma and marijuana and alcohol dependence. (T. 20). Plaintiff had a left finger injury and a right shoulder injury that the ALJ found were not severe. In addition, plaintiff had an ankle injury in 2007 "while working as a construction worker," but the ALJ also found that injury to be non-severe because it would not have impacted plaintiff's ability to work prior to the date last insured. (*Id.*)

The ALJ then determined that plaintiff's seizure disorder was not of Listing severity, analyzing the impairment under Listings 11.02 and 11.03, both relating to epilepsy, and under Listing 12.09 for the plaintiff's marijuana and alcohol dependence.[5] (T. 20). Although plaintiff's mother, Ms. Geraldine Helmer ("Ms. Helmer"), wrote a letter stating that plaintiff averaged nine to sixteen seizures per month, neither of the two consulting specialists found that plaintiff's neurological impairments met the listings. (T. 21). The ALJ stated that plaintiff's medical records during the relevant time period did not corroborate the number of seizures that Ms. Helmer claimed the plaintiff suffered. The ALJ also found "most importantly" that

---

she was reviewing evidence from the period before November 14, 2001, she specifically stated that she was not reopening the prior determination. (T. 18). The ALJ stated that she "embarked upon such strictly for purposes of background and comparison for a perspective of the current medical evidence. In so doing, the undersigned has not considered the merits of the prior denial determination, directly or indirectly, for the purposes of reopening or revising the determination thereon." (*Id.*) Plaintiff does not argue that the ALJ constructively reopened the prior decision, and this court agrees that no constructive reopening occured.

[5] This listing directs the reader back to the seizure listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.09(I).

plaintiff was noncompliant with his treatment, including continuing to drink alcohol, missing follow up appointments, and missing doses of, or improperly taking, his medications. (T. 21).

At step four of the sequential analysis, the ALJ found that plaintiff had the RFC for unskilled light work, with the restriction that he could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, and balance; could never work around unprotected heights and moving mechanical parts; could never operate a motor vehicle; and could occasionally work in extremes of cold and heat, and in conditions of humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibrations. (*Id.*)

The ALJ reviewed the objective medical evidence and noted that plaintiff's most frequent seizures occurred when he was drinking alcohol or forgetting or improperly taking his medications, even after the expiration of his insured status, as late as 2010. (T. 22-24). The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, but found plaintiff's credibility was "poor" regarding the intensity, persistence, and limiting effects of these symptoms during the period in question. (T. 24). The ALJ stated that plaintiff's responses at the hearing were "vague," although she acknowledged that the relevant period was remote in time, and plaintiff's testimony concerning such remote events could be "impacted by the lapse of time and not in a deliberate attempt to mislead." (*Id.*) The ALJ did note that more recently, after November of 2007, long after his insured status expired, plaintiff's condition appeared to be getting worse, and he was having more problems with staring spells, headaches,

8

and seizures. (T. 24-25). He did not file the current application until almost seven years after the expiration of his insured status, and most of the evidence in the record pertains to the period after December of 2001. (T. 25).

The ALJ reviewed Dr. Gitlow's and Dr. Cloninger's reports. (T. 27). Dr. Gitlow noted that plaintiff's seizure frequency and intensity were directly related to his alcohol intake. (T. 27). After reviewing the medical records, Dr. Cloninger found that plaintiff could perform light work with "seizure precautions." (T. 27). The ALJ also discussed Ms. Helmer's estimate that plaintiff was averaging nine to sixteen seizures per month. (T. 27-28). The ALJ determined that there was no indication that this statement pertained to the relevant time period and appeared "to be based on the claimant's problems since late 2007 . . . ." (T. 28).

The ALJ then found that plaintiff could not perform his previous work, and considered the testimony of two VEs, one at each hearing, in determining that plaintiff could perform other work in the national economy. (T. 29). At both hearings, plaintiff's attorney asked the VE whether an individual who had uncontrolled seizures, even one per week, would be able to work. The VE stated that, given those facts, there would be no jobs that plaintiff could perform.[6] (T. 29). The ALJ found, however, that there was no medical evidence during the period in question, substantiating either uncontrolled seizures or even weekly seizures. (T. 30). Based upon the VEs' testimony that there were several jobs available that plaintiff could

---

[6] Although both VEs testified that there was no work for someone who experienced weekly seizures, the ALJ only discussed the first VE's testimony with respect to plaintiff's attorney's question. (T. 29).

have performed, the ALJ found that plaintiff was not disabled prior to the expiration of his insured date.

## VI. **Listed Impairment**

### A. **Legal Standards**

At step three of the disability analysis, the ALJ must determine if plaintiff suffers from a listed impairment. *See* 20 C.F.R. §§ 404.1520, 416.920. It is plaintiff's burden to establish that his or her medical conditions meet *all* of the specific medical criteria of a particular listed impairment. *Pratt v. Astrue,* 7:06-CV-551, 2008 WL 2594430 at *6 (N.D.N.Y. 2008) (citing *Sullivan v. Zebley,* 493 U.S. 521, 530 (1990)). If a plaintiff's "impairment 'manifests only some of those criteria, no matter how severely,' such impairment does not qualify." *Id.* In order to demonstrate medical equivalence, a plaintiff "must present medical findings equal in severity to all the criteria for the *one* most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. at 531 (emphasis added).

### B. **Application**

Plaintiff argues that the ALJ erred in failing to find that plaintiff met Listing 11.02, relating to convulsive epilepsy. Listing 11.02 requires documentation "by detailed description of a typical seizure pattern, including all associated phenomena: occurring more frequently than once a month in spite of at least 3 months of prescribed treatment," with either daytime episodes of loss of consciousness and convulsive seizures, or nocturnal episodes manifesting residuals that interfere significantly with plaintiff's activity during the day. 20 C.F.R. Pt. 404, Subpt. P, App.

1 § 11.02(A), (B).

Although the actual cause of plaintiff's seizure disorder is unclear, he was initially examined in 1990 after he was accidentally hit on the head with a hammer while working on a roof. (T. 458). A note, signed by Physician Assistant Thomas Fletcher and plaintiff's treating primary care physician, Joseph A. Lorenzetti, dated March 3, 1997, states that at the time of the accident, plaintiff suffered a seizure and was taken to the hospital. After being released from the hospital, he suffered another more serious seizure at home and was taken back to the hospital. After 1990, plaintiff had occasional, but "very infrequent" seizure activity. (*Id.*) He began having seizures on a more frequent basis in May of 1996, and he began taking medication to control them. His medications were changed and/or adjusted throughout the course of many years.

The medical records in this case cover 1996 through 2010, however, plaintiff's failure to appeal his prior decision, and the ALJ's failure to grant reopening of the prior administrative decision, limits this court to determining whether plaintiff's condition became disabling after November 14, 2001, but prior to December 31, 2001, when his insured status expired. A review of the evidence shows there is insufficient evidence to make such a showing, and the ALJ's determination that plaintiff was not disabled during the time period in question is supported by substantial evidence, notwithstanding the apparent worsening of plaintiff's condition in recent years. Because there are few medical records that are actually dated during the time period in question, the ALJ reviewed other medical evidence in support of her findings, while

specifically stating that she was not reopening the prior decision. The court must do the same.

In attempting to support his argument that his seizures were of listing-level frequency prior to December 31, 2001, plaintiff cites a treating physician's report stating that plaintiff's medication was not adequately controlling his seizures, he was experiencing seizures more frequently than once per month, that he lost consciousness during the seizures, often bit his tongue, and was having memory lapses. (Pl.'s Br. at 16) (citing T. 449 – Dr. Joseph Lorenzetti). Plaintiff also cites an Emergency Room repot from Geneva General Hospital, dated June 13, 1997, arguing that this document shows plaintiff having a seizure while he was in the hospital, and that he bit his tongue during the episode. (*Id.* citing T. 334).

Both of the reports cited by plaintiff are within the time period covered by the prior decision. In any event, while the documents cited support plaintiff's assertion, there are other documents from the same time that indicate plaintiff's ongoing use of alcohol was responsible for the frequency of the seizures. Plaintiff went to the Emergency Room on June 6, 1997, complaining of seizures, but the doctor noted that plaintiff had been drinking as recently as May 25, 1997. (T. 338). As stated by many of plaintiff's doctors, plaintiff's alcohol consumption and drug use increased the chances that he would have seizures. Plaintiff's citation of the June 13, 1997 report, while indicating that he was experiencing seizures, does not account for the fact that the seizures could have been precipitated by alcohol use and would not, as discussed below, support a finding that plaintiff's impairment met the severity of a Listing.

In addition, on September 29, 1997, plaintiff again went to the Geneva Hospital Emergency Room, suffering from Dilantin "intoxication." (T. 350-51, 357-58). Plaintiff apparently took his medication, then fell asleep. When he woke up, he could not remember whether he took his medication, so he took more. Dr. Heidi Schwartz, a consultant who examined plaintiff, initially noted "suboptimal control" of plaintiff's seizures with Dilantin and Phenobarbitol. However, Dr. Schwartz stated that upon further questioning, she determined that plaintiff's heavy alcohol use and non-compliance with his medications had frequently been a problem for him. (T. 357). Plaintiff told the doctor that he had been abstinent for one month, but told the emergency room personnel that he had alcohol as recently as September 25, 1997 (four days prior to the overdose). He also continued to smoke marijuana two to three times per day. (*Id.*) In her report, Dr. Schwartz stated that she thought that plaintiff had not given the Dilantin an "adequate trial." (T. 358).

On April 16, 1999, Dr. William Kingston, plaintiff's treating neurologist, stated that plaintiff had not been in for a follow-up appointment since "last June," but that *he* stated that his seizures were continuing at a rate of 9-10 per month. (T. 414). Plaintiff stated that he had been "non-compliant" with treatment in the past, but he was "better" now. (*Id.*)

On August 25, 1999, Dr. Kingston, stated that plaintiff had one seizure in four months,[7] and that the seizure occurred because plaintiff missed his medication, and he was under some stress. (T. 413, repeated on 430). Dr. Kingston also stated that

_____

[7] Four months would have been about the time of his April 1999 appointment, at which he stated that his seizures were as frequent as 9-10 per month.

13

plaintiff's seizures were under "good control on his present anti-convulsant regimen." (*Id.*) Dr. Kingston stated that plaintiff was not employed at that time, but he was "helping take care of his grandfather who is in poor health." (*Id.*)

On June 6, 2000, Dr. Dieter Eppel, D.O. noted that "[h]e has been doing fine. Still having occasional seizures." (T. 432). The doctor also stated that plaintiff told him that he was moving to Texas. (*Id.*) On November 27, 2000, plaintiff stated that he had no seizures for "several months." (T. 424). He then had two seizures, but the doctor stated that plaintiff admitted that he drank alcohol prior to having the seizures. (*Id.*) The doctor told him to stop drinking, and he stated that plaintiff was "well aware" that alcohol "appears to be a problem for him." (*Id.*)

On August 6, 2001, plaintiff went to the emergency room and told personnel that he "wiped out on [his] bike 20 minutes ago." (T. 365). Plaintiff suffered a separated right shoulder. (T. 368). Although the emergency room report states that plaintiff had a "history" of seizures, there is no mention in that report that a seizure was the cause of plaintiff's fall. In fact, the report states that plaintiff fell "while drinking and riding bicycle." (T. 366). The report further states "admits to 12pk of beer." (T. 365). However, the next day, on August 7, 2001, plaintiff saw Dr. Eppel, and the progress note states that "Timothy had a seizure, falling and striking the right side of his head, also his right shoulder." (T. 424). On October 12, 2001, Dr. Eppel's note simply states that plaintiff had two seizures that week and would like his medication levels checked. (T. 426).

The rest of the medical reports are dated after the date plaintiff was last insured,

although some of them reflect upon plaintiff's condition prior to that date. There are very few records from 2002 through 2004. There are three notes dated in 2002, one on January 26, 2002, one on February 7, 2002, and the third dated March 11, 2002, all from D.O. Eppel. (T. 433). The notes from January and February just indicate medication refills, and the entry dated March 11, 2002 states that plaintiff had three seizures the day before, but that he had not missed any medication. (*Id.*) The records start appearing with dates in 2002. There is only one narrative report from 2004 and a medication monitoring report, indicating that plaintiff's Phenobarbitol and Tegretol levels were at a therapeutic level. (T. 400-401, 403).

A report from the Port Byron Medical Center, dated December 7, 2005, stated that plaintiff's last seizure was on November 28, 2005, when plaintiff had five seizures, but also stated that he went without medication for 24 hours prior to the seizures. (T. 398). The report also states that plaintiff had been in Texas for four months. (*Id.*)

In a report, dated January 16, 2008, long after plaintiff's insured status expired on December 31, 2001, Dr. Robert Gross, a treating neurologist at the Strong Epilepsy Center in Rochester, New York commented in a section entitled "Psychosocial Assessment," that plaintiff "[h]ad been able to maintain employment in the construction field most of his adult life up until last June." (T. 498). "Last June" would have been June of 2007. However, plaintiff states that he has not worked since 1996. (T. 58, 61, 246). There are other indications in the record that plaintiff was much more active than asserted, and had less seizures than he claimed. On November

12, 2007, Dr. Gross, wrote that

> He sustained an injury earlier *this year* when he was
> performing his work as a construction worker and fell,
> hitting his head as he did so and fracturing his right leg,
> requiring surgery for fixation . . . .
>
> . . . Mr. Capron was living in Texas but has moved back here
> after the fall just described above (in June). . . . He is not
> working *now* because of seizures. . . .

(T. 507) (emphasis added). Dr. Gross also stated that there were "complicating factors
to [plaintiff's] seizure history." (T. 507). These complicating factors were that
plaintiff abused alcohol to a significant extent in the past, and that it would not be
unusual for him to drink thirty (30) beers *daily*. (*Id.*) Plaintiff also used cocaine and
crack "and continues to use marijuana daily presently." (*Id.*) Dr. Gross noted that
"[f]ortunately, [plaintiff] has been abstinent from alcohol for the past two years . . . ."
(*Id.*) This notation means that plaintiff continued drinking at least until 2005, long
past the expiration of his insured status. Plaintiff also smoked two packs of cigarettes
per day. (T. 507)

The ALJ in this case also consulted two medical experts by sending them
interrogatories after the first hearing with plaintiff. The interrogatories specifically
referenced the Listings and asked whether the evidence of record established that
plaintiff's condition was severe enough to meet a listed impairment. Dr. Gitlow stated
that the records indicate that plaintiff's alcohol consumption was a major factor in the
frequency of his seizures. (T. 570). Dr. Gitlow also notes that despite plaintiff stating
that he was abstinent at various times, the clinical tests showed "ongoing significant

alcohol use" as late as 2009. (T. 570). "There is no indication that [plaintiff] has had

any periods of abstinence from addictive chemicals." (*Id.*) Dr. Gitlow states that the

only mental impairment present for the period from 5/8/96 until 12/31/01 "is

alcohol/marijuana dependence." (*Id.*)

Because plaintiff does have a seizure disorder, Dr. Gitlow states that he would

be restricted from driving, climbing, [and] operating heavy machinery . . . ." (T. 571).

Although the plaintiff was not found to have any impairment of activities of daily

living ("ADLs"), Dr. Gitlow did state that the seizure disorder might occur with such

frequency as to produce post-seizure difficulties on a frequent basis. (T. 571). Dr.

Gitlow stated that for more information, an "ME" (medical expert) with expertise in

neurology should be consulted. However, Dr. Gitlow again pointed out that plaintiff's

alcohol and substance abuse would affect "seizure frequency and intensity." Thus, Dr.

Gitlow opinion was that although the post-seizure state could be limiting, the seizure

frequency in plaintiff's case was probably due to his substance abuse.

The second ME consulted by the ALJ was Dr. Cloninger, a neurologist, who

wrote that plaintiff had a complex seizure disorder with secondary generalization. (T.

578). Dr. Cloninger did state that it was "difficult" to determine the seizure

frequency, stating that Ms. Helmer estimated that plaintiff had 9-16 seizures per

month, but that alcohol and marijuana would "lower seizure threshold." (T. 578). Dr.

Cloninger stated that neither plaintiff's neurological impairment, nor any combination

of his impairments met or equaled the severity of a listed impairment. (*Id.*) Both

consultants completed RFC evaluations for plaintiff. (T. 580-85 – Cloninger; 575-77 –

Gitlow). Essentially, other than the limitations on climbing, heights, and heavy machinery, plaintiff's physical activities were not greatly limited.

Plaintiff argues that because the specialists stated that the frequency of the seizures was difficult to determine, the ALJ should have given greater weight to Ms. Helmer's written statement, claiming that during the "time frame" of 1996 to 2001, plaintiff "averaged about 9 to 16 [seizures] per month and that was not counting the absentee seizures." (T. 560). Plaintiff's counsel argues that Ms. Helmer gave detailed descriptions of plaintiff's seizures, and therefore, he meets the listing, which requires specific description of the seizures. (Pl.'s Br. at 16).

It is true that the Listings provide that testimony of persons "other than the claimant is essential for description of type and frequency of seizures if professional observation is not available." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00(A). Plaintiff cites only part of this section. The section also states that a plaintiff's *compliance* is important to the consideration and "[w]here documentation shows that the use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level." *Id. See Aponte v. Barnhart*, No. 02 Civ. 14, 2003 WL 1702002, at *2-4 (S.D.N.Y. March 31, 2003) (seizures relating to noncompliance and alcohol abuse were not disabling under the regulations); *Sanchez v. Callahan*, No. 97-CV-6617, 200 WL 290272, at *6 (E.D.N.Y. March 15, 2000) (plaintiff's seizures not disabling when related to noncompliance with medication or alcohol abuse).

A review of Ms. Helmer's statement shows that she states that the "time frame"

18

to which she is referring is from 1996 to 2001. The issue in this case is only a six week period between November 14, 2001 until December 31, 2001. The prior denial is not reviewable because of the ALJ's decision not to reopen. In any event, the medical records do not support her assertions regarding the frequency of plaintiff's seizures. The document was written by Ms. Helmer in 2010, and she was attempting to describe incidents between 1996 and 2001. The ALJ considered Ms. Helmer's submission, but found that her statements appeared to be related more to the recent worsening of plaintiff's condition, and her statements regarding the relevant time period were not consistent with the medical evidence. (T. 27-28).

This court agrees. Although it is understandable that Ms. Helmer would be interested in helping her son, the time period to which she refers is more than nine years prior to her statement. Ms. Helmer describes many of the same instances as are documented in the medical records, but Ms. Helmer does not mention the fact that many of the same reports indicate that the seizures in question were precipitated by alcohol consumption or by plaintiff's failure to comply with his medication dosage. In fact, she refers to plaintiff's shoulder injury, purportedly after having suffered a seizure, when the Emergency Room records indicate that his injury was caused after he had been drinking and fell while riding his bicycle. It was only the next day that he visited his treating physician and told him that the injury occurred due to a seizure.

Ms. Helmer also states that plaintiff is *currently* unable to live alone. However, for some of the time in question, and presumably when he lived and worked in Texas, he did not live with his mother and step-father. It is also unclear how long he lived in

Texas. On June 6, 2000, Dr. Eppel stated that the plaintiff was doing "fine," still having "occasional" seizures, but was moving to Texas, although he had not "hooked up [with] a neurologist in that area." (T. 432, 437). In January of 2008, Dr. Gross noted that plaintiff was living in Texas until he fell while working in June of 2007. (T. 498). Dr. Gross noted that plaintiff had been able to maintain employment in construction "up until his fall last June." (T. 498). This statement is corroborated by another note from Dr. Gross, written on November 12, 2007, in which he states that plaintiff was living and working in Texas, but fell off the roof, breaking his leg. (T. 507).

This court does not doubt that plaintiff has a seizure disorder, that he had limitations on his ability to work during the period in question, or that his seizures have gotten worse over the past years.[8] However, plaintiff's insured status expired on December 31, 2001, and the court may not consider the fact that his condition became worse after the expiration of his insured status. The ALJ properly rejected Ms. Helmer's assessment of the frequency and severity of plaintiff's seizures. The regulations indicate that the ALJ must *consider* the testimony of third parties, not that the ALJ must *accept* that testimony. The ALJ considered Ms. Helmer's statement, but found that it was inconsistent with the medical evidence during the relevant time period. Thus, the ALJ's determination that plaintiff did not show that his impairment was of listing-level severity prior to the expiration of his insured status is supported by

---

[8] It is also true that the physicians of record state that many of plaintiff's seizures were precipitated by alcohol consumption, and that plaintiff continued to drink long after he told physicians that he had been abstinent. He admitted that he never stopped smoking marijuana, even in the more recent medical reports.

substantial evidence in the record.

The fact that plaintiff's impairments were not of Listing-level severity does not end the inquiry. A Listing determination is only Step 3 of the five-step disability analysis, and plaintiff argues that the ALJ also erred at Steps 4 and 5 of the analysis.

## VII.  **RFC Determination**

### A.    **Legal Standard**

Once the ALJ determines that plaintiff cannot return to his previous employment, the regulations require a determination of what plaintiff can do despite his impairments. In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F. Supp. 456, 460 (W.D.N.Y. 1987)).

RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-

1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

Although the RFC determination is reserved for the commissioner, the RFC assessment is still a medical determination that must be based on medical evidence of record, and the ALJ may not substitute her own judgment for competent medical opinion. *Walker v. Astrue*, No. 08-CV-828, 2010 WL 2629832, at *6 (W.D.N.Y. June 11, 2010) (citing 20 C.F.R. §§ 404.1527(e)(2); 416.927(e)(2)), (Report-Recommendation), *adopted*, 2010 WL 2629821 (W.D.N.Y. June 28, 2010); *Lewis v. Comm'r of Soc. Sec.*, No. 6:00-CV-1225, at *3 (N.D.N.Y. Aug. 2, 2005)). In addition to the plaintiff's own physicians and other medical sources, the ALJ may rely upon a "medical advisor" who is a non-examining state agency "medical consultant" or an examining consultative physician to whom the plaintiff was sent at agency expense. *See Walker v. Astrue*, 2010 WL 2629832 at *6-7.

### B.    Application

Plaintiff argues that the ALJ erred in determining plaintiff's RFC. Plaintiff does not dispute the exertional portion of the stated RFC. Plaintiff argues that the ALJ erred when she afforded "great weight" to Dr. Lorenzetti's opinion which limited plaintiff from driving, heights, dangerous equipment, and climbing, but "failed to account for" Dr. Lorenzetti's statements regarding plaintiff's compliance with medications, the frequency and symptoms of seizures, post-seizure manifestations, and his opinion that plaintiff would miss more than four days of work per month. (Pl.'s Br. at 18) (citing T.26). Plaintiff argues that the ALJ may not "pick and choose" only the

parts of physician's reports that support her findings.

The court notes that the plaintiff's counsel is citing to an report prepared by Dr. Lorenzetti after November of *2009*.[9] (T. 459). This report was written eight years after the expiration of plaintiff's insured status, and the ALJ was not citing to that report when she discussed Dr. Lorenzetti's opinion. (T. 26). The ALJ's opinion properly cited Dr. Lorenzetti's reports that were dated more closely to the period in question. The ALJ noted that in March of 1997, Dr. Lorenzetti stated that the plaintiff was unable to drive a car, work around heavy equipment or heights or climb. (T. 26). In November of 1997, Dr. Lorenzetti reported that the plaintiff was temporarily totally disabled, and in March of 1999, Dr. Lorenzetti deferred any opinion of plaintiff's disability to Dr. Kingston, who was a neurologist and had begun taking care of plaintiff.[10] (T. 448).

The ALJ did not rely only on a "portion" of Dr. Lorenzetti's report. The ALJ rejected Dr. Lorenzetti's opinion of temporary total disability, given in *1997*, because two years later, he deferred to Dr. Kingston's evaluations. The ALJ also stated that Dr. Lorenzetti's findings that plaintiff could not drive or operate heavy equipment,

---

[9] This report is a form entitled "Seizures Evaluation." The copy quality is poor, and the bottom of the page is cut off, so neither the signature, nor the date is visible. It is not clear that there is even a date at the bottom of the page. However, one of the questions on the form asks when was the plaintiff's last seizure, and the answer is "Nov. '09." (T. 459). Thus, it is clear that the report was written after November 2009.

[10] Dr. Lorenzetti's report is dated March 15, 1999. (T. 448). Plaintiff was being examined for "disability," and Dr. Lorenzetti noted that plaintiff was having difficulty gaining adequate control of his seizures, but that he was following up with Dr. Kingston. (*Id.*) The report specifically states that "[a]s far as any disability, final determination of this should come from his neurologist, Dr. Kingston." (T. 448).

work at heights, or climb were supported by the rest of the relevant medical evidence *for the period in question*, including the opinions of the two medical experts, Drs. Gitlow and Cloninger. The ALJ's did err in the analysis of Dr. Lorenzetti's report, and the RFC determination is supported by substantial evidence.

## VIII. Credibility

### A. Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record. *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ." 20 C.F.R. § 404.1529(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work.

*Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

### B. Application

Plaintiff argues that the ALJ erred in discrediting both his and his mother's statements regarding the intensity and the frequency of his seizures. The court has already discussed the ALJ's rejection of Ms. Helmer's written statement above. In rejecting plaintiff's credibility, the ALJ gave plaintiff the benefit of the doubt by stating that plaintiff was testifying as to a period of time that was nine years prior to the date of the hearing, and plaintiff's memory "may be impacted by the lapse of time and not in a deliberate attempt to mislead." (T. 24). The ALJ then considered the medical reports that were written during the relevant time period, together with the plaintiff's activities during the same time period, and made a credibility determination based on an evaluation of all the evidence. (T. 24-25).

As stated above, much of the contemporaneous medical evidence shows that plaintiff was doing well on his medication until he chose to use alcohol or drugs, or until he missed a dose of his medication. The records indicate that during the time period in question, plaintiff would go a few months without having a seizure, and even then, the eventual seizure was due to alcohol consumption or missed medication.[11] (T. 413, 424). The court also notes that there were times, even long after the expiration of plaintiff's insured status that he was seizure free for a significant time. On June 9, 2008, Dr. Gross from the Strong Epilepsy Center noted that plaintiff was last seen in January of 2008, and "[i]n the last five months, he has had two seizures, both on the same day *and following . . . missing a dose each of his Zonegran and Tegretol*." (T. 492).

The ALJ was also correct in noting that plaintiff's daily activities during the time at issue belied his claims of severe restrictions. Although plaintiff claimed that he was not independent and had to live with his parents, the medical records indicate that for some of the time, he lived alone or with a girlfriend whose children he took care of during the day.[12] (T. 57-58). In 2001, he was riding his bicycle. Although it is

---

[11] On August 25, 1999, Dr. Lorenzetti commented that plaintiff had only one seizure in four months, and it occurred because he missed his medication. (T. 413). The doctor also stated that plaintiff was under "good control on his present anticonvulsive regimen." (*Id.*) On November 27, 2000, plaintiff admitted that he had no seizures for several months, but then consumed alcohol and suddenly had two seizures. (T. 422, 424). These statements from plaintiff's treating physician are inconsistent with plaintiff's (and his mother's) claim that during the period in question, plaintiff was having 9-16 seizures per month.

[12] Plaintiff did admit to living with his fiancé and taking care of her children for a "short period of time." (T. 57-58).

unclear how long he was in Texas,[13] apparently plaintiff moved to Texas and was

working there.[14] Finally, although throughout the period in question, plaintiff

continued to claim off-and-on that he had stopped drinking, Dr. Gitlow found that

plaintiff's blood tests showed that he was still drinking long after he stated that he had

stopped. (T. 570). All the doctors found that the use of alcohol and drugs precipitated

plaintiff's seizures. The ALJ also mentioned that plaintiff's medications did not cause

serious side effects, except for the time that plaintiff took too much medication.[15] (T.

25). Thus, the ALJ's partial rejection of plaintiff's credibility is supported by

substantial evidence.

## IX.  VE Hypothetical

### A.  Legal Standards

Once the plaintiff shows that he cannot return to his previous work, the

Commissioner bears the burden of establishing that the plaintiff retains the RFC to

perform alternative substantial gainful work in the national economy. *Butts v.*

---

[13] The court also notes that during plaintiff's testimony, the ALJ was asking him about his previous work as a "framer" in Texas. (T. 65-66). The ALJ asked plaintiff when he was performing that job in Texas, and plaintiff said that he was not sure of the dates. (T. 66). Plaintiff stated that he stopped performing that job because he fell off the roof and broke his leg due to a seizure. (*Id.*) The ALJ asked whether it was prior to 2001, and plaintiff stated that "[i]t was around '96." (*Id.*) Clearly, that was not true because the medical records indicate that plaintiff lived in Texas and fell of the roof while working, breaking his leg in June of *2007*. (T. 498).

[14] As stated above, on January 16, 2008, Dr. Gross noted that plaintiff's longest time without a seizure was approximately 6 months, and that he had been able to maintain employment in construction until June of 2007. (T. 498).

[15] In a "Report of Contact", dated December 9, 2008, plaintiff answered "None" when asked if there were any side effects of his medications. (T. 252). *See also* (T. 265 – no side effects from Topamax). However, in another form, dated March 19, 2009, plaintiff indicated that he had "some sleepiness" as a result of taking the same medications. (T. 299).

*Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[16] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

---

[16] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

## B. Application

In this case, plaintiff's impairment is not related to his exertional capabilities. The ALJ consulted two[17] different VEs in making the determination of whether plaintiff could perform work in the national economy. Plaintiff does not question the qualifications of the experts, rather, he argues that the ALJ did not ask a hypothetical question that took all of his limitations into account. If hypothetical questions do not include all of a plaintiff's impairments, limitations and restrictions, or are otherwise inadequate, the VE's response cannot constitute substantial evidence to support a conclusion that the claimant is not disabled. *Melligan v. Chater*, No. 94-CV-944S, 1996 WL 1015417, at *8 (W.D.N.Y. Nov. 14, 1996); *Gladle v. Astrue*, 7:12-CV-284 (NAM), 2013 WL 4543147, at *5 (N.D.N.Y. Aug. 27, 2013).

Plaintiff argues that the hypothetical was incomplete because the ALJ did not take into account plaintiff's "uncontrolled" seizures that were occurring at least once a week. (Pl.'s Br. at 24). VE Edwards testified at the first hearing[18] in response to plaintiff's counsel's questioning, that an individual who was having at least one seizure per week would not be able to maintain any competitive employment.[19] (T. 71-72). The VE at the second hearing concurred with this opinion. (T. 44-45). Because the ALJ properly determined credibility and RFC and properly analyzed the medical evidence, the hypothetical posed by the ALJ was proper. There was no medical

---

[17] Dothel W. Edwards, Jr. (T. 163-78 – Resume) and Jay Steinbrenner (T. 225-26 – Resume).

[18] May 11, 2010. (T. 48).

[19] VE Edwards had already testified that there were several types of jobs that an individual with the limitations in the ALJ's hypothetical question could still perform. (T. 69-71).

evidence that, during the relevant time period, plaintiff suffered uncontrolled or weekly seizures that were not related to failure to take medication, alcohol, or drug abuse. Thus, the ALJ's determination that plaintiff was not disabled between November 14, 2001 and December 31, 2001 when his insured status expired is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: December 2, 2013

Hon. Andrew T. Baxter
U.S. Magistrate Judge